# Exhibit A-1

TO PLAINTIFFS' NOTICE OF CONSTITUTIONAL QUESTIONS

FILED
DALLAS COUNTY
5/28/2014 10:42:08 PM
GARY FITZSIMMONS
DISTRICT CLERK

**Cause No. DC-14-04053**

| | | |
|---|---|---|
| **LNV CORPORATION,** | § | |
| **ITS SUCCESSORS AND ASSIGNS,** | § | **IN THE DISTRICT COURT** |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| | § | |
| | § | **DALLAS COUNTY, TEXAS** |
| **SAMUEL G. BREITLING,** | § | |
| **JO ANN BREITLING,** | § | |
| **GMAC MORTGAGE, INC.,** | § | |
| **NORTHWEST MORTGAGE, INC.,** | § | |
| **PINNACLE REALTY ADVISORS, INC.,** | § | |
| **and PALISADES ACQUISITION V, LLC** | § | |
| | § | |
| **Defendants.** | § | **134TH JUDICIAL DISTRICT** |

## MOTION FOR JUDICIAL NOTICE OF INFORMATION AND CRIMINAL INDICTMENT AND PLEA AGREEMENT OF LORRAINE BROWN

Now comes defendants Samuel G. and JoAnn S. Breitling representing themselves, pursuant to Texas Rules of Evidence 201 "Judicial Notice of Adjudicative Facts" and hereby requests this Court take Judicial Notice of the documents described herein and in support states as follows:

1.  THE BREITLINGS move this Court to take judicial notice of:

    *Information regarding Lorraine Brown, United States of America v. Lorraine Brown, Case No. 3:12-cr-198-J-25 MCR, (M.D. Fla.)* (attached hereto as "Exhibit A.)

    *Plea Agreement of Lorraine Brown, United States of America v. Lorraine Brown, Case No. 3:12-cr-198-J-25 MCR, (M.D. Fla.)* (attached hereto as "Exhibit B.)

2.  Under the Texas Rules of Evidence, judicial notice may be taken at any stage of the proceeding. Tex. R. Evid. 201(f). A "judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." See Tex. R. Evid. 201(b). The Court may take judicial notice of records of any court of record of the United States. A court shall take judicial notice if requested by a party and supplied with the necessary information.  A fact of which judicial notice can be taken is "a matter of evidence and knowledge on the part of courts which requires no formal proof." *Harper v. Killion, 162 Tex. 481, 348 S.W.2d 521, 523 (1961) (quoting Burtis v. Butler Bros., 148 Tex. 543, 226 S.W.2d 825, 830 (1950)*).  A criminal conviction is conclusive proof and operates as an estoppel on defendants (note: in this case the plaintiffs, LNV, Dovenmuehle Mortgage Inc. ("DMI") and their attorney Jeffrey Hardaway with Codilis & Stawiarski as known LPS service providers and co-conspirators with Brown in the commission of her crimes) as to the facts supporting the conviction in a subsequent civil action. *Local 167 of International Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers of America v. United States, 291 U.S. 293, 298-99, 78 L. 1 Ed. 804, 54 S. Ct. 396 (1934); Brown v. United States, 207 Ct. Cl. 768, 524 F.2d 693, 705 (1975).*

3.  On November 20, 2012, Lorraine Brown, a former executive of Lender Processing Services, Inc. (LPS) and DocX LLC, a LPS company, pleaded guilty to conspiracy to commit mail and wire fraud.

4.  In mid-2005, Jacksonville, Florida based Fidelity National Financial, Inc. (FNF) purchased DocX from Brown and her partners. Through corporate reorganizations within

FNF, DocX later fell under ownership of Fidelity National Information Services, Inc. (FNIS). In mid-2008, FNIS spun off a number of business lines into a new publicly-traded entity, Lender Processing Services, Inc (LPS) based in Jacksonville, Florida. At that time, DocX was re-branded as "LPS Document Solutions, a Division of LPS." Following the spin-off, Brown was the President and Senior Managing Director of LPS Document Solutions. At all times relevant to this Information, Brown was the chief executive of the DocX / LPS operations.

5. **THE BREITINGS** move this Court to take Judicial Notice of Brown"'s information and Plea Agreement because these documents confirm that LPS employees (and employees of LPS service providers like DMI and Codilis & Stawiarski) engaged in a massive fraud scheme in the preparation of hundreds of thousands of mortgage-related documents, including Mortgage Assignments, and Mortgage Allonges. The Breitings contend that the Mortgage Assignments and Mortgage Allonges prepared and filed by LPS in her case, bearing the signatures of K.C.Wilson as Attorney in Fact for Elllington Mortgage Partners, L.P.; Jeanne Stafford Orange County California notary commission # 1729363; Christopher Corcoran as Vice President of Deutsche Bank National Trust Company as Trustee; Amy Brackett as Assistant Secretary of Aames Funding Corportation DBA Aames Home Loan; and K. Branson Orange County California notary commission # 1211863 are such fraudulent mortgage assignments.

6. The Breitings further contend that attorneys representing LNV in this case (and MGC Mortgage Inc. in their earlier litigation as Plaintiff"'s in the 116[th] District Court) are Brown"'s unnamed criminal co-conspirators. They are in fact LPS Service providers.

They use the same computer software system developed by Brown and her co-conspirators to commit the crimes for which the United States has already convicted them.

7. By way of background, LPS was hired by residential mortgage services to (among other things) assist in creating and executing mortgage-related documents filed with recorders" offices across the country.

8. At the direction of Brown and other co-conspirators, employees of LPS, including those who were not authorized to sign documents and temporary workers hired to sign documents without quality control and without legally required knowledge specific to the Mortgages for which the documents were prepared, began forging and falsifying signatures of the mortgage-related documents that they had been hired to prepare and file with property recorders" offices.

9. After these documents were falsely signed and falsely notarized, Brown and her co-conspirators authorized LPS employees to file and record with property recorders" offices across the country.

10. Many of LPS"s temporary employees signed thousands of mortgage assignments each day, often signing the names of other persons on the Mortgage Assignments that would then be witnessed and notarized. These employees often signed as officers of banks and mortgage companies. The employees signed without reading the documents or in any way ascertaining the truth of the matter presented therein, including the grantor, grantee, and the date of the purported transfer.

11. Many of the documents, including mortgage assignments and lost note affidavits, were later relied upon in court proceedings including foreclosure proceedings and federal bankruptcy actions.

12. Brown admitted that she and others took various steps to conceal their actions from law enforcement authorities and others. These steps to conceal included testing new employees to ensure they could mimic [forge] signatures.

13. A criminal conviction is conclusive proof and operates as an estoppel on defendants (or Plaintiffs as in the case of LNV here) as to the facts supporting the conviction in a subsequent civil action. *Local 167 of International Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers of America v. United States, 291 U.S. 293, 298-99, 78 L. 1 Ed. 804, 54 S. Ct. 396 (1934); Brown v. United States, 207 Ct. Cl. 768, 524 F.2d 693, 705 (1975).* "Yet they need not all be indicted or named. Indeed, an indictment charging that the named defendant and „other persons unknown . . . did . . . conspire" was approved in *State v. Hightower, 221 S.C. 91, 94, 69, S.E.2d 363, 366 (1952)[.]" McAninch & Fairey 481.* In Hightower, there was "ample evidence that the conspirators, though unknown, did exist." *McAninch & Fairey 481.* Criminal liability is sometimes referenced as the Pinkerton doctrine, which is based on the seminal United States Supreme Court case of *United States v. Pinkerton, 328 U.S. 640 (1946).* Federal judges frequently describe the doctrine in jury instructions as "the hand of one is the hand of all to the conspiracy." Below is an excerpt of a Pinkerton jury instruction that was approved by the Fourth Circuit Court of Appeals in *United States v. Aramony, 88 F.3d 1369 (4th Cir. 1996):*

"Whenever it appears beyond a reasonable doubt from the evidence in the case that a conspiracy existed and that a defendant was one of the members, then the statements thereafter knowingly made and the acts thereafter knowingly done by any person likewise found to be a member may be considered by the jury as evidence in the case as to the defendant found to have been a member, even though the statements and the acts may have occurred in the absence of and without the 16 knowledge of the defendant, provided such statements and acts were knowingly made and done during the continuance of such conspiracy and in furtherance of some object or purpose of the 18 conspiracy.

Furthermore, all members of the conspiracy are equally guilty of all crimes committed pursuant to and in furtherance of the conspiracy. For example, if, in the process of committing the bank fraud pursuant to the conspiracy one of the co-conspirators illegally laundered the money proceeds, all of the conspirators would be criminally liable for the unlawful money laundering as well as the bank fraud and criminal conspiracy. " *United States v. Zabic, 745 F.2d 464, 474-75 (7th Cir. 1984).*

14. The documents attached hereto as Exhibits "A" and "B" may be accessed online from PACER under United States of America v. Lorraine Brown, Criminal Docket # 3:12-cr-00198-HLA-MCR-1.

15. Timely written notice of this request is hereby given by email and postal mail service upon Plaintiff's counsel as required by law.

WHEREFORE, pursuant to Texas Rule of Evidence 201 THE BREITLINGS move this Court to take Judicial Notice of the Information and Plea Agreement of Lorraine Brown *United States of America v. Lorraine Brown, Case No. 3:12-cr-198-J-25 MCR, (M.D. Fla.)* without hearing, and for such other and further relief as this Court deems just and proper under the circumstances.


JoAnn S Breitling                    Samuel G. Breitling



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.

LORRAINE BROWN

Case No. 3:12-cr- 1 9 8 -J- 25 M C R

Count 1:   18 U.S.C. § 371

## INFORMATION

The United States Attorney charges:

### COUNT ONE
**(Conspiracy to Commit Mail and Wire Fraud)**

### Background

At all times material herein, unless otherwise specified:

1.     LORRAINE BROWN, a resident of Georgia, founded DocX LLC (hereinafter, "DocX") in the 1990s in Ohio.  In the early 2000s, Brown relocated the bulk of DocX's operations to Alpharetta, Georgia (the Alpharetta operations of DocX LLC are referred to herein as "DocX" regardless of the time frame).

2.     In mid-2005, Jacksonville, Florida based Fidelity National Financial, Inc. ("FNF") purchased DocX from Brown and her partners.  Through corporate reorganizations within FNF, DocX later fell under ownership of Fidelity National Information Services, Inc. ("FNIS").  In mid-2008, FNIS spun off a number of business lines into a new publicly-traded entity, Lender Processing Services, Inc. ("LPS"), based in Jacksonville, Florida.  At that time, DocX was rebranded as



EXHIBIT
A

"LPS Document Solutions, a Division of LPS."  Following this spin-off, Brown was the President and Senior Managing Director of LPS Document Solutions, which constituted DocX's operations in Alpharetta.  At all times relevant to this Information, Brown was the chief executive of the DocX operations.

3.      DocX's main clients were residential mortgage servicers (the "servicers"), which typically undertake certain actions for the owners of mortgage-backed promissory notes. These duties include, among others, accepting and recording mortgage payments, paying taxes and insurance from borrower escrow accounts, and conducting or supervising the foreclosure process when necessary.

4.      Servicers hired DocX to perform a number of these actions, including assisting in creating and executing mortgage-related documents filed with recorders' offices. The majority of documents created and recorded by DocX between 2003 and 2009 were lien releases, which evidence payment in full of a mortgage-backed note.  DocX also executed mortgage assignments, which purport to transfer the note's ownership interest.  Mortgage assignments were typically created during the foreclosure process, and the volume of these documents dramatically increased at DocX during the foreclosure crisis of 2007 to 2009.  DocX also signed lost note and lost assignment affidavits related to mortgage documents.

2

5.      From at least March 2003 through November 2009, Brown marketed DocX as an outsourcing solution to mortgage servicers for filing and recording mortgage documents throughout the United States.  Brown represented to clients that DocX had robust quality control procedures in place to ensure a thorough and proper signing, notarization, and recordation process.  As a result of these representations, clients hired DocX.

6.      When hiring DocX to sign documents, servicers typically issued special corporate resolutions delegating document execution authority to specific, authorized, and trained personnel at DocX.  The DocX employees who were given express signing authority from DocX's clients and who, as represented by Brown, were purportedly trained to ensure that the clients' documents were properly created, signed, and notarized were called "Authorized Signers."  These documents were then generally recorded by DocX with the appropriate local property recorders' offices throughout the country.

### The Conspiracy and its Objects

7.      From in or about 2005 through in or about October 2009 at

Jacksonville in the Middle District of Florida, Alpharetta, Georgia, and elsewhere

throughout the United States,

LORRAINE BROWN,

the defendant herein, did knowingly and willfully combine, conspire, confederate

and agree with others to commit certain offenses, to wit:

a.      execute and attempt to execute a scheme and artifice to

defraud, and to obtain money and property by means of material false and

fraudulent pretenses, representations, and promises, by utilizing the United

States mail and private and commercial interstate carriers, for the purpose of

executing such scheme and artifice, in violation of Title 18, United States Code,

Section 1341; and,

b.      execute and attempt to execute a scheme and artifice to

defraud, and to obtain money and property by means of material false and

fraudulent pretenses, representations, and promises, by transmitting and causing

to be transmitted by means of wire communications in interstate and foreign

commerce, writings, signs, visual pictures, and sounds, for the purpose of

executing such scheme and artifice, in violation of Title 18, United States Code,

Section 1343.

## Manner and Means of the Conspiracy and Scheme and Artifice

8.    The manner and means by which Brown, co-conspirators, and others sought to accomplish the purposes and objectives of the conspiracy include, but are not limited to, the following:

a.    Beginning in or about 2005, employees of DocX, at the direction of Brown and others, began forging and falsifying signatures on the mortgage-related documents that they had been hired to prepare and file with property recorders' offices throughout the United States.

b.    Unbeknownst to DocX's clients, the Authorized Signers were instructed by Brown and other DocX employees to allow other, unauthorized, DocX employees to sign, and to have the document notarized as if the actual Authorized Singer had executed the document.

c.    Brown also hired temporary workers to sign as Authorized Signers. These temporary employees worked for much lower costs and without the quality control represented by Brown to DocX's clients.  In fact, some of these temporary workers were able to sign thousands of documents a day. These mortgage-related documents were fraudulently notarized by DocX employees even though the Authorized Signer did not actually sign the document.

d.    These unauthorized signing and notarization practices allowed DocX, Brown, and others to generate greater profit and make more money.

5

e.     After these false documents were signed and notarized, DocX filed them through the mails or by electronic methods with local county property records offices.  Many of these documents, particularly mortgage assignments and lost note or assignment affidavits, were later relied upon in court proceedings, including property foreclosures and in federal bankruptcy court.  Brown knew that these property recorders, as well as those who received the documents such as courts, title insurers, and homeowners, relied on these documents as genuine.

f.     Brown and others also took various steps to conceal their actions from detection from clients, LPS corporate headquarters, law enforcement authorities, and others.

### Overt Acts

9.     On or about August 13, 2008, Brown caused to be delivered to Jacksonville, Florida, by commercial interstate carrier from DocX, an Assignment of Mortgage filed with the Clerk of Circuit Court, Duval County, Florida, which Assignment of Mortgage had been executed on August 12, 2008, with false and fraudulent signatures of Authorized Signers and which bore a false and fraudulent notarization attestation.

10.     On or about February 23, 2009, Brown caused a DocX business client to make a payment by electronic funds transfer of $357,185.60, in

6

interstate commerce, from a financial institution in Iowa to a DocX account held

at a financial institution in Georgia.

In violation of Title 18, United States Code, Section 371.


ROBERT E. O'NEILL
United States Attorney

By:    _____
MARK B. DEVEREAUX
Assistant United States Attorney


_____
MAC D. HEAVENER, III
Assistant United States Attorney
Deputy Chief, Jacksonville Division


DENIS McINERNEY
Chief, Fraud Section - Criminal Division
United States Dept. of Justice

By:    _____
RYAN ROHLFSEN
Trial Attorney, Fraud Section


_____
GLENN LEON
Assistant Chief, Fraud Section


7



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE

UNITED STATES OF AMERICA          :

        v.          :          CASE NO. 3:12 – C r -19ᵦ - J - ZS MCR

LORRAINE BROWN          :

### PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America by and through

United States Attorney for the Middle District of Florida Robert E. O'Neill and United

States Department of Justice Criminal Division - Fraud Section Chief Denis McInerney

(hereinafter also referred to as "the Government" or the "United States"), and the

defendant Lorraine Brown with defendant's attorney Mark Rosenblum, Esq., agree as

follows:

A.     **Particularized Terms**

    1.     **Count Pleading To**

        The defendant shall enter a plea of guilty to Count One of the Information.

Count One charges the defendant with Conspiracy to Commit Mail and Wire Fraud, in

violation of 18 U.S.C. § 371.

    2.     **Maximum Penalties**

        Count One carries a maximum sentence of up to five (5) years

imprisonment, a fine of up to a fine of up to $250,000 or twice the gross pecuniary gain

or twice the gross pecuniary loss occasioned by the offense, a term of supervised

Defendant's Initials _____          AF Approval _____



EXHIBIT

B

release of not more than three (3) years, and a special assessment of $100, said

special assessment to be due on the date of sentencing. With respect to certain

offenses, the Court shall order the defendant to make restitution to any victim of the

offense, and with respect to other offenses, the Court may order the defendant to make

restitution to any victim of the offense, or to the community, as set forth below.

3.  **Elements of the Offense**

The defendant acknowledges understanding the nature and elements of

the offense with which defendant has been charged and to which defendant is pleading

guilty. The elements of Count One are:

<u>First:</u>  That two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit mail fraud or wire fraud, as charged in the information;

<u>Second:</u>  The Defendant knew the unlawful purpose of the plan and willfully joined in it; and

<u>Third:</u>  One of the conspirators committed an overt act in furtherance of the conspiracy.

4.  **No Further Charges**

If the Court accepts this plea agreement, the United States Attorney's

Office for the Middle District of Florida and the United States Department of Justice

agree not to charge defendant with committing any other federal criminal offenses

known to the Government at the time of the execution of this agreement related to the

conduct giving rise to this plea agreement.

Defendant's Initials  _____        2

5.      **Mandatory Restitution to Victim of Offense of Conviction**

Pursuant to 18 U.S.C. §§ 3663A(a) and (b), defendant agrees to make full restitution to any victims of the offense, as determined by the Court at sentencing.

6.      **Acceptance of Responsibility - Three Levels**

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will not oppose the defendant's request to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG §3E1.1(b), the United States agrees to file a motion pursuant to USSG §3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

Defendant's Initials           3

7.   **Forfeiture of Assets**

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. 981 and 28 U.S.C. § 2461(c), whether in the possession or control of the United States or in the possession or control of the defendant or defendant's nominees. The property and the amount of proceeds to be forfeited to the United States will be determined by the Court at or before the sentencing hearing. The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action. The defendant also hereby agrees that the forfeiture described herein is not excessive and, in any event, the defendant waives any constitutional claims that the defendant may have that the forfeiture constitutes an excessive fine. The defendant agrees that the United States shall, at its option, be entitled to the forfeiture of any property (substitute assets) of the defendant up to the value of the money judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the Government. Pursuant to the provisions of Rule 32.2(b)(1), the United States and the defendant request that at the time of accepting this plea agreement, the court make a determination that the Government has established the requisite nexus between the property subject to forfeiture and the offense(s) to which defendant is pleading guilty and enter a preliminary order of forfeiture. Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture shall be final as to the defendant at the time it is entered, notwithstanding the requirement that it be made a part of the sentence and be included in the judgment.

Defendant's Initials  X _____   4

The defendant agrees to forfeit all interests in the properties described above and to take whatever steps are necessary to pass clear title to the United States. These steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Defendant further agrees to take all steps necessary to locate property and to pass title to the United States before the defendant's sentencing.  To that end, defendant agrees to fully assist the Government in the recovery and return to the United States of any assets, or portions thereof, as described above wherever located.  The defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control and those which are held or controlled by a nominee.  The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States.

The defendant agrees that the United States is not limited to forfeiture of the property described above.  If the United States determines that property of the defendant identified for forfeiture cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; then the United States shall, at its option, be entitled to forfeiture of any other property (substitute assets) of the defendant up to the value of any property described above.  This Court shall retain jurisdiction to settle any disputes arising from application of this clause.  The

Defendant's Initials _____          5

defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

8. <u>**Concurrent Sentencing**</u>

The United States agrees not to oppose any argument by the Defendant with the sentencing Court that any sentence imposed by the Court run concurrent with any sentences imposed by any state courts for state criminal charges generally based upon the conduct underlying the instant plea. Should there be a sentence imposed by any other state court, it is the parties' intention that any sentence ordered by the Court in this case be served prior to any remaining time on any such state terms of imprisonment. This agreement in no way limits the Court's authority to render whatever lawful sentence it deems appropriate in this case.

9. <u>**Cooperation with Ongoing Prosecutions of Others**</u>

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons or entities, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters. Such cooperation includes a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and

Defendant's Initials                    6

other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require.

**B.** **Standard Terms and Conditions**

    **1.** **Restitution, Special Assessment and Fine**

        The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1) (limited to offenses committed on or after April 24, 1996); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663 (limited to offenses committed on or after November 1, 1987), including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. On each count to which a plea of guilty is entered, the Court shall impose a special assessment, to be payable to the Clerk's Office, United States District Court, and due on date of sentencing. The defendant understands that this agreement imposes no limitation as to fine.

    **2.** **Supervised Release**

        The defendant understands that the offense(s) to which the defendant is pleading provide(s) for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

Defendant's Initials           7

3.   **Sentencing Information**

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit, upon execution of this plea agreement, an affidavit reflecting the defendant's financial condition. The defendant further agrees, and by the execution of this plea agreement, authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court.

4.   **Sentencing Recommendations**

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by

Defendant's Initials _____          8

the United States Probation Office.  The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office.  Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the Government regarding any recommendations by the Government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement.  The Government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the Government's recommendations contained herein.

5. **Defendant's Waiver of Right to Appeal**

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the Government exercises its right to appeal the sentence

Defendant's Initials _____                9

imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

6.    **Middle District of Florida and Criminal Division Agreement**

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and the United States Department of Justice Criminal Division - Fraud Section and cannot bind other federal, state, or local prosecuting authorities, although these offices will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

7.    **Filing of Agreement**

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

8.    **Voluntariness**

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorneys for the Government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if

Defendant's Initials           10

any).  The defendant also understands that defendant has the right to plead not guilty or

to persist in that plea if it has already been made, and that defendant has the right to be

tried by a jury with the assistance of counsel, the right to confront and cross-examine

the witnesses against defendant, the right against compulsory self-incrimination, and

the right to compulsory process for the attendance of witnesses to testify in defendant's

defense; but, by pleading guilty, defendant waives or gives up those rights and there will

be no trial.  The defendant further understands that if defendant pleads guilty, the Court

may ask defendant questions about the offense or offenses to which defendant

pleaded, and if defendant answers those questions under oath, on the record, and in

the presence of counsel (if any), defendant's answers may later be used against

defendant in a prosecution for perjury or false statement.  The defendant also

understands that defendant will be adjudicated guilty of the offenses to which defendant

has pleaded and, if any of such offenses are felonies, may thereby be deprived of

certain rights, such as the right to vote, to hold public office, to serve on a jury, or to

have possession of firearms.

9.   **Factual Basis**

Defendant is pleading guilty because defendant is in fact guilty.  The

defendant certifies that defendant does hereby admit that the facts set forth in the

attached "Factual Basis," which is incorporated herein by reference, are true, and were

this case to go to trial, the United States would be able to prove those specific facts and

others beyond a reasonable doubt.

Defendant's Initials           11

10.   **<u>Entire Agreement</u>**

This plea agreement constitutes the entire agreement between the Government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.



11.   **Certification**

The defendant and defendant's counsel certify that this plea agreement

has been read in its entirety by (or has been read to) the defendant and that defendant

fully understands its terms.

DATED this ___13___ day of November, 2012.


ROBERT E. O'NEILL
United States Attorney

_LORRAINE BROWN_
Defendant

By: _Mark B. Devereaux_
MARK B. DEVEREAUX
Assistant United States Attorney


MARK ROSENBLUM, Esq.
Attorney for Defendant

MAC D. HEAVENER, III
Assistant United States Attorney
Deputy Chief, Jacksonville Division


DENIS McINERNEY
Chief, Fraud Section - Criminal Division
United States Dept. of Justice

By: _____
RYAN ROHLFSEN
Trial Attorney, Fraud Section

_____
Glenn Leon
Assistant Chief, Fraud Section


Defendant's Initials ___LB___          13

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                          Case No. 3:12

LORRAINE BROWN

---

### PERSONALIZATION OF ELEMENTS

1.      Do you admit that at least from 2005 and continuing thereafter until in or about October 2009, in Duval county, in the Middle District of Florida, Alpharetta, Georgia, and elsewhere, that two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit mail and wire fraud, as charged in the information?

2.      Do you admit you knew the unlawful purpose of the plan and willfully joined in it?

Defendant's Initials                 14

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                          Case No. 3:12

LORRAINE BROWN

---

### FACTUAL BASIS

At a trial of this case, the United States would be prepared to prove beyond reasonable doubt the following facts:

### BACKGROUND

### *Brown, DocX, and LPS*

The defendant, Lorraine Brown (hereinafter "Brown"), founded DocX LLC in the 1990s in Ohio. As discussed more fully below, DocX LLC was involved in the preparation and recordation of mortgage-related documents throughout the country. In the early 2000s, Brown relocated the bulk of DocX LLC's operations to Alpharetta, Georgia – a suburb of Atlanta. (The Alpharetta operations of DocX LLC are referred to herein as "DocX" regardless of the timeframe and corporate ownership.)

In mid-2005, Jacksonville, Florida-based Fidelity National Financial, Inc. ("FNF") purchased DocX from Brown and her partners for approximately $6 million.  Through corporate reorganizations within FNF, DocX later fell under ownership of Fidelity National Information Services, Inc. ("FNIS"). In mid-2008, FNIS spun off a number of business lines into a new publicly-traded entity, Lender Processing Services, Inc.

Defendant's Initials _____

("LPS"), based in Jacksonville, Florida.  At that time, DocX was rebranded as "LPS Document Solutions, a Division of LPS."  Following this spin-off, Brown was the President and Senior Managing Director of LPS Document Solutions, which constituted DocX's operations.  At all times relevant to this statement of facts, Brown was the chief executive of DocX.

### *DocX's Operations*

DocX's main clients were residential mortgage servicers (the "servicers"), which typically undertake certain actions for mortgage lenders. These duties include, among others, accepting and recording mortgage payments, paying taxes and insurance from borrower escrow accounts, and conducting or supervising the foreclosure process when necessary.

DocX maintained a proprietary system called the Recorders Information Database ("RID"), which contained the various filing requirements and fees imposed by each of the thousands of county recorders' offices throughout the United States. DocX's servicer-clients could pay for access to the RID database.  Clients could also hire DocX to assist in creating and executing mortgage-related documents filed with recorders' offices. The majority of documents created and recorded by DocX between 2003 and 2009 were lien releases, which evidence payment in full of a mortgage-backed note. DocX also executed mortgage assignments, which purport to transfer the note's ownership interest.  Mortgage assignments were typically created during the foreclosure process, and the volume of these documents dramatically increased at DocX during the foreclosure crisis of 2007 to 2009. DocX also signed lost note and lost assignment affidavits related to mortgage documents.

Defendant's Initials _____                    2

From at least March 2003 through November 2009, Brown marketed DocX as an outsourcing solution to mortgage servicers for filing and recording mortgage documents throughout the United States. Brown represented to clients that DocX had robust quality control procedures in place to ensure a thorough and proper signing, notarization, and recordation process.  As a result of these representations, clients hired DocX.

When hiring DocX to sign documents, servicers typically issued special corporate resolutions delegating document execution authority to specific, authorized, and trained personnel at DocX. The DocX employees who were given express signing authority from DocX's clients and who, as represented by Brown, were purportedly trained to ensure that the clients' documents were properly created, signed, and notarized were called "Authorized Signers." These documents were then generally recorded by DocX with the appropriate local property recorders' offices throughout the country.

In exchange for this service, DocX was paid a fee by its clients that varied from approximately $5 to $15 per document depending upon, among other items, the type of document and client. Between 2003 and 2009, DocX generated approximately $60 million in gross revenue.

Defendant's Initials ⟨ᗷ⟩⟋            3

### THE SCHEME

#### *False Signing and Fraudulent Notarization*

Beginning in or about 2003 and continuing through November 2009, employees of DocX at the direction of Brown and others, began forging and falsifying signatures on the mortgage-related documents that they had been hired to prepare and file with property recorders' offices throughout the United States. Unbeknownst to the clients, the Authorized Signers were instructed or authorized by Brown to allow other DocX employees, who were not Authorized Signers, to sign and notarize the mortgage-related documents as if the actually executed by the Authorized Signer.

For example, one of Brown's co-conspirators who was a member of Brown's senior management team, after being named an Authorized Signer for a client, sent an e-mail to a colleague stating that she actually had no intention of ever signing a single document. Rather, Brown's co-conspirator planned on using other employees to sign the documents on her behalf, knowing that those documents would also be notarized as if the co-conspirator herself had actually signed the document. Thus, even through clients were told that a senior DocX manager would be preparing and signing the client documents, there was never any intention to do so.

Brown implemented these signing practices at DocX to enable DocX (and Brown) to generate greater profit. Specifically, DocX was able to create, execute, and file larger volumes of documents using these signing and notarization practices. More documents meant more money. To further increase profits, DocX also hired temporary workers to sign as Authorized Signers. These temporary employees worked for much lower costs and without the quality control represented by Brown to DocX's clients. In fact, some of

Defendant's Initials _____        4

these temporary workers were able to sign thousands of documents a day.

After these documents were falsely signed and fraudulently notarized, Brown authorized DocX employees to send them through the mails or by electronic methods for recording with local county property records offices across the nation. Many of these documents – particularly mortgage assignments, lost note affidavits, and lost assignment affidavits – were later relied upon in court proceedings, including property foreclosures and federal bankruptcy actions. Brown understood that these property recorders, courts, title insurers, and homeowners, relied upon the documents as genuine.

Indeed, on at least one occasion, in or around 2005 an official with a county recorder's office in California called DocX after noticing that DocX submitted a number of documents obviously falsified signatures. The official told DocX employees that these documents were fraudulent. DocX then re-filed these documents with that county after properly signing and notarizing them.  Brown was aware of this incident.

The exact number of documents created by DocX with fraudulent signature and notarizations is presently unknown. It is estimated, however, that between 2003 and 2009 well over 1 million such documents were executed and filed with property recorders' offices across the nation.

### *Efforts to Conceal*

While engaging in this scheme to charge fees to DocX clients for products and services that the clients never received, Brown and others took various steps to conceal their actions from detection.

Defendant's Initials _____                    5

Brown and her co-conspirators took actions to conceal the fake signatures and false notarization. For example, Brown's co-conspirator, at Brown's direction and authorization, trained new DocX signers to mimic the actual signatures of the Authorized Signers, and then tested them on their ability to do so before signing client documents. To assist in the scheme, samples of the actual Authorized Signers' signatures were taped to the signing tables. To provide an additional layer of sham authenticity, the documents were then falsely notarized. Brown authorized or directed these practices.

Additional acts of concealment were taken. After certain DocX employees raised concerns about the legality of the signing practices, Brown developed official-looking, in-house signing policies purporting to delegate signing authority from the Authorized Signers to other DocX employees. Starting in 2003, the policy was called "Facsimile Signature." In early 2009, the practice was labeled "Surrogate Signing."

Brown and her co-conspirators also concealed their conduct from clients, instructing DocX employees to hide their signing practices during client visits. Further, Brown hid DocX's signing practices from LPS's corporate headquarters. For example, in mid-2009, LPS auditors visited Alpharetta to conduct a risk assessment of DocX. Prior to the visit, Brown provided documents to the auditors describing the process DocX used in executing documents. Brown deliberately concealed from the auditors that the above-described signing practices were being used at that time.

### *Further Acts of Deception and Attempted Cover-Up*

In October 2009, an individual sent a letter to LPS corporate headquarters in Jacksonville, Florida alleging fraud and forgery in the execution of documents related to

Defendant's Initials _____                                6

his mortgage by DocX.  Upon receipt of the letter, LPS corporate representatives confronted Brown. Brown falsely stated that she was unaware of DocX's signing practices and blamed the conduct on two "rogue" employees. Shortly thereafter, LPS terminated Brown's employment.

Even after she was fired, Brown attempted to conceal her role in the scheme. Specifically, on February 9, 2010, Brown was interviewed by an agent with the Federal Bureau of Investigation ("FBI").  During that interview, Brown made several material false statements to the FBI, including the following:  (i) at no time did Brown instruct any individual at DocX to pursue the "Surrogate Signing" practices for the business; (ii) Brown was unaware of DocX's "Surrogate Signer" program and was never informed by her management staff that they were engaging in such activity with their clients' financial documentation; and (iii) Brown did not learn of DocX's use of the "Surrogate Signer" program until LPS corporate personnel first contacted her in October 2009. Ms. Brown knowingly made these false statements to the FBI in an effort to further conceal her role in the scheme.